Melinda S. DARLAND, Plaintiff,

v.

Jo Anne B. BARNHART, Commissioner of Social Security, Defendant.

No. CIV. 01–3018.

United States District Court, D. South Dakota, Central Division.

Oct. 25, 2002.

John A. Hamilton, South Dakota Advocacy Service, Sioux Falls, SD, for Plaintiff.

Cheryl Schrempp Dupris, Asst. U.S. Atty., Pierre, SD, for Defendant.

## ORDER

### INTRODUCTION

Plaintiff brought this action pursuant to § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to obtain judicial review of defendant's final decision denying plaintiff's claim. This matter was referred to United States Magistrate Judge Mark A. Moreno for the purposes of conducting any

necessary hearing and issuing a report and recommendation.

Plaintiff filed a motion for summary judgment. The magistrate filed his proposed Report and Recommendations on August 6, 2002, recommending that plaintiff's motion for summary judgment be denied and that the Commissioner's decision be affirmed. Copies of such Report and Recommendations were served upon the parties as required by 28 U.S.C. § 636. Plaintiff timely filed objections (Doc. 21). I have now read the transcript and have otherwise conducted a *de novo* review of the record. References to the transcript will be T followed by the page number.

## DECISION

Judicial review of the Commissioner's decision is limited to determining whether the decision is supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g).

> Substantial evidence is more than a scintilla of evidence. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)). Under this standard, we do not reverse the [Commissioner] even if this court, sitting as finder of fact, would have reached a contrary result; "[a]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision."

*Baker v. Heckler,* 730 F.2d 1147, 1150–51 (8th Cir.1984); *Nelson v. Sullivan,* 966 F.2d 363, 365 n. 6 (8th Cir.1992).

## I. Plaintiff's Subjective Complaints.

Plaintiff contended in her motion for summary judgment that the Administrative Law Judge ("ALJ") improperly discredited her subjective complaints of her symptoms resulting from ulcerative colitis. Specifically, plaintiff claims that the ALJ's finding that she has "four formed stools per day" is not supported in the record. Plaintiff asserts that this finding is crucial to a determination in this case because her claimed "loose urgent stools" prevent her from working.

In making determinations with respect to disability under Title XVI (Supplemental Security Income or SSI benefits), the provisions of 42 U.S.C. § 423(d)(5) of Title II (Federal Old–Age, Survivors, and Disability Insurance or SDI benefits) apply. 42 U.S.C. § 1382c(a)(3)(H)(i). Section 423(d)(5) provides, in part:

> An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability as defined in this section; there must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all evidence required to be furnished under this paragraph (including statements of the individual or his physician as to the intensity and persistence of such pain or other symptoms which may reasonably be accepted as consistent with the medical signs and findings), would lead to a conclusion that the individual is under a disability.

The Eighth Circuit has held, however, that the ALJ "may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them." *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir.1984).

The absence of an objective medical basis which supports the degree of severity

of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:

1. the claimant's daily activities;
2. the duration, frequency and intensity of the pain;
3. precipitating and aggravating factors;
4. dosage, effectiveness and side effects of medication;
5. functional restrictions.

The adjudicator is not free to accept or reject the claimant's subjective complaints solely on the basis of personal observations. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole.

*Id.*

■ Under *Polaski,* the ALJ "may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them." *Polaski v. Heckler,* 739 F.2d at 1322. In the present case, the objective medical evidence does not support the plaintiff's subjective complaints "at all." Plaintiff filed her petition in October of 1998, claiming that she was then currently disabled. The medical evidence does not support the plaintiff's claims that she was then, or thereafter, experiencing the degree of diarrhea or diarrheal incontinence to which she testified. In fact, the medical notes of May 27, 1998, state that the plaintiff was down to four stools a day which were "primarily formed" (T224). The medical record of July 27, 1998, states that the plaintiff specifically stated that her bowel movements "are normal" (T227). She takes no medication or anything else for the diarrhea (T47). Yet it is common knowledge that many over-the-counter aids are available to provide bulk-forming with regard to bowel movements.

Further, nothing whatsoever as to claims of back problems or alleged disabling headaches has ever been "medically determined." There is nothing in the medical records to show that she ever sought medical treatment for any claimed problems with headaches or her back or even reported them to a physician. In fact, the evidence is that she never reported any back problems (T56). There is no medical evidence at all to support plaintiff's claim of inability to lift weights, especially a gallon of milk or a bag of sugar weighing nine pounds as claimed by the plaintiff (T56). By advancing such claims, the plaintiff obviously caused the ALJ to seriously question her credibility.

■ This case presents the same problems often presented in cases involving largely subjective evidence. In other words, if the patient tells the doctor about stool problems, the doctor really has no way of knowing whether or not the patient experiences stool problems with the frequency or intensity described. Likewise, the doctor has no way to know whether or not the patient has headaches or even has a headache at the time of the appointment with the doctor. We know that "subjective complaints may be discounted if there are inconsistencies in the evidence as a whole." *Id.* The ALJ correctly applied the *Polaski* factors and concluded that plaintiff's subjective complaints of symptoms were not consistent with the evidence and that her allegations of being unable to work were not credible. In any event, whether the plaintiff's stools are formed or loose would seem to be immaterial. The ALJ determined that the plaintiff could perform light work but that she would have to have access at work to a bathroom when she

needed it, which was approximately four times a day. The magistrate found, and so do I, that the ALJ's findings are supported by substantial evidence in the record as a whole. The plaintiff asserts that "once every two months she experiences fecal incontinence" (T50). Even assuming that to be true, it certainly would not prevent her from performing light work.

## II. Questions as to credibility bearing upon the decision of the ALJ.

References will be made to the testimony of the plaintiff. She has always had diarrhea (T32). This, of course, is contrary to the medical records and what she was telling her doctors. Yet she did not know how long the condition of "no diarrhea" had lasted (T32). Disputing the medical records that she was essentially free of diarrhea for six years, she has always had "small amounts of diarrhea" (T33). She complained of blood in her stools (T34) but the medical records report that she stated that she was "beginning her cycle" and was unsure whether that was the cause of the blood she observed (T227). Yet her biggest concern and reason for returning to the doctor after a six year period was the blood (T34). She works at housework for about one hour at a time and then needs to go to the bathroom (T36). Despite the medical records, she testified she has more than four bowel movements per day (T37). She testified she has "four or more" per day (T38). She testified that she goes to the bathroom four times per day (T50). She is able to do normal housework, cooking and laundry (T39). Yet she testified (as did her husband) that she would spend "most of the morning" each day in the bathroom (T59). She starts her day at not later than 6:00 a.m. and being in the bathroom consumes most of the morning (T60). It does not "taper off" until 11:00 a.m. or noon and she can "probably go three or four times" also in the afternoon (T60). When asked about the medical records of November of 1998 showing four stools per day "formed often", she testified that her stools go from some formed to mostly loose (T39, 40). She has real runny stools once in a couple months (T40 and 50). Despite other claims of a back problem and a headache problem, she testified that she has no health problems other than the diarrhea (T41). Some of this is understandable since she testified she has a headache problem about once a month (T45).

In plaintiff's handwritten letter of January of 1999 she states: "I still have occasional episodes where I'll have diarrhea" (T88). She also states she spends the first two hours of her morning using the bathroom (T89), a statement that is inconsistent with her testimony and that of her husband. She set forth in her request for a hearing that stress causes her need to use the restroom "several times during the day" (T94). She made this statement on May 12, 1999.

Contrary to her testimony at the hearing, she stated in her answer to the daily activities questionnaire that she does not need anyone to help with the shopping (T128). In her answers to the questionnaire she also stated that when she begins a task she has no trouble finishing it (T130). She also stated that she gets diarrhea when she eats something that disagrees with her (T130).

These are simply some of the examples that constitute substantial evidence allowing the ALJ to have decided the case as he did. Again, the task of the judiciary is not to necessarily rule as the judge would have decided the case.

## III. Hypothetical Question.

Plaintiff contended in her motion for summary judgment that the hypothetical question posed to the Vocational Expert

("VE") upon which the ALJ relied[1] in finding that she was not entitled to SSI benefits was based on facts not supported by the record. She asserted that the hypothetical should have included the fact that the hypothetical person had loose stools (diarrhea) and fecal incontinence. Instead, the ALJ posed a hypothetical question that included the fact that the hypothetical claimant had four formed stools per day. The magistrate concluded that there was substantial evidence to support the ALJ's finding as to the "four formed stools" portion of the hypothetical question posed to the VE. I agree although I believe it is immaterial. The magistrate further found that "the ALJ's hypothetical adequately captured the concrete consequences of Darland's deficiencies and set forth the impairments he accepted as true in light of the medical evidence and the record as a whole." Again, I agree.

■■■■ Plaintiff objects to the magistrate's conclusion that the hypothetical question to the VE, upon which the ALJ relied in denying benefits, was an appropriate hypothetical question. "In order to constitute substantial evidence, testimony from a[VE] must be based on a properly phrased hypothetical question." *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir.1999). The hypothetical "should precisely set out the claimant's particular physical and mental impairments." *Id.* (quoting *House v. Shalala*, 34 F.3d 691 (8th Cir.1994)). The ALJ properly relies upon the opinion of the VE where the hypothetical question posed to the expert reflected an accurate account of claimant's limitations which the ALJ found actually existed, based upon substantial evidence. *Onstad v. Shalala*, 999 F.2d 1232, 1234–35 (8th Cir.1993). The hypothetical question posed to the VE on which the ALJ relied did in fact contain an accurate account of

the plaintiff's limitations which the ALJ found were credible.

Plaintiff, in her objections, now raises additional objections to the hypothetical question which she did not raise in any meaningful way in her motion for summary judgment and which were therefore not considered by the magistrate. She now asserts that the hypothetical question posed to the VE (on which the VE relied) was not a proper question because it failed to include certain non-exertional limitations, namely that she must avoid concentrated exposure to fumes, odors, dust, gases, and poor ventilation. She further now asserts that the hypothetical question posed to the VE was not a proper question because it told the VE to assume that she was capable of doing light work rather than setting forth a description of her limitations resulting from her ulcerative colitis.

■■■ A claimant may not make arguments in her objections to a magistrate judge's report when those arguments have not been argued to the magistrate. *Roberts v. Apfel*, 222 F.3d 466, 470 (8th Cir. 2000). The Eighth Circuit has held that the "purpose of referring cases to a magistrate for recommended disposition would be contravened if parties were allowed to present only selected issues to the magistrate, reserving their full panoply of contentions for the trial court." *Id.* (quoting *Reciprocal Exch. v. Noland*, 542 F.2d 462, 464 (8th Cir.1976)). This matter has been pending since August of 2001. Plaintiff filed her motion for summary judgment in January of 2002. The plaintiff's late reply brief was filed March 19, 2002. The magistrate considered this matter in the interim and filed his Report and Recommendations on August 6, 2002. This matter has

---

**1.** The ALJ posed three different hypothetical questions to the VE, each containing differing hypothetical restrictions. The ALJ relied upon the second such hypothetical.

been pending long enough and the issues first briefed in the objections should not further delay this matter.

I would note that plaintiff did make passing references in her reply brief, which was filed late, to these latter two issues. She argued at length in her brief, as well as her objections, that the only "major" difference between the first hypothetical question and the second was the difference in the quality of stools (loose or formed) that the hypothetical claimant had. She made only a passing reference to the fact that the hypothetical upon which the ALJ relied did not contain the restriction that the hypothetical claimant avoid concentrated exposure to fumes, odors, dust, gases, and poor ventilation.

Although the magistrate did not specifically refer to the foregoing alleged error in his Report and Recommendations, he did specifically find that the hypothetical upon which the ALJ relied did "set forth the impairments he accepted as true in light of the medical evidence and the record as a whole." The ALJ did not conclude that plaintiff was so limited. The plaintiff's testimony with regard to any problems with concentrated exposures was almost non-existent. The light work suggested by the VE would not involve any concentrated exposures of any kind.

The plaintiff also made a passing reference in her reply brief to the effect that the ALJ told the VE in the hypothetical that he should assume the hypothetical claimant could perform light work activity and that such a statement "casts doubt on its appropriateness." The magistrate did not address this contention with any more depth than did the plaintiff. The magistrate noted that the plaintiff's residual functional capacity to perform light exertional work was supported by the evidence. "A hypothetical is sufficient if it sets forth impairments supported by substantial evidence in the record and accepted as true by the ALJ." *Davis v. Apfel,* 239 F.3d 962, 966 (8th Cir.2001). The ALJ's hypothetical sufficiently set forth plaintiff's impairments which the ALJ accepted as true. *See Davis v. Apfel,* 239 F.3d at 965 ("The expert was asked to consider whether jobs are available for an individual of Davis' age, education, and vocational profile with the residual functional capacity for 'work which is no more than light or sedentary from an exertional standpoint . . .' "). Plaintiff does not contend that she cannot perform light exertional work. No health care provider has ever expressed the opinion that she cannot so perform or that she is disabled in any manner. Plaintiff admits that the health care providers have not "come up with a definitive diagnosis" of what she has (T31). She contends that she cannot work because she is required to have frequent, unexpected bathroom breaks that "involve loose stools that at times may result in an accident if the employee could not immediately leave her task." The hypothetical question posed to the VE sufficiently set forth that limitation, to the extent that the ALJ accepted it as true; the ALJ specifically asked the VE to assume that the hypothetical claimant could work if she had access to bathrooms as needed.

Plaintiff also now advances the argument that she did not go to a doctor or other health care provider for six years because of lack of money. There is no evidence of that in the record. In fact, the testimony of the plaintiff herself was that she did not see any need to return to see a doctor during the six year period.

## CONCLUSION

There is substantial evidence in the record as a whole to support the ALJ's conclusion that plaintiff is not disabled under Title XVI of the Social Security Act. The magistrate carefully read the record and has carefully set forth in the report and recommendations the evidence in the rec-

ord to support what was done by the ALJ. I adopt those findings as well.

I note in particular, that, as the magistrate pointed out, plaintiff herself testified that she was able to perform her household labors with appropriate bathroom breaks. She can perform such work if a bathroom is accessible and if she could use it whenever she needed. One of the occupations described by the VE was that of a housekeeper. It is common and universal knowledge that housekeepers working in a motel have almost constant access to a private bathroom in every room. The VE recognized this (T72 and 73) and also recognized that a laundry worker in a motel could also so function (T73). That would be true in a private home as well where housekeeping services might be performed. Plaintiff in fact has previous work experience along these lines (T141). In that respect, it matters not whether plaintiff's stools are loose or firm or, for that matter, how many times a day she is required to use the bathroom. All plaintiff's arguments as to the frequency and quality of her stools are simply irrelevant in this context.

### ORDER

IT IS ORDERED:

1) The report and recommendations of the United States Magistrate Judge (Doc. 20) is accepted and adopted.

2) The motion of plaintiff (Doc. 12) for a summary judgment is denied.

3) The objections of plaintiff (Doc. 21) to the magistrate's report and recommendations are overruled.

1. The Honorable Charles B. Kornmann, United States District Judge, Presiding.

2. No hearings were held because none were needed to decide the case.

3. Darland also applied for Social Security Disability Insurance (SSDI) but later con-

4) The final administrative decision to the effect that the claimant is not eligible for benefits under Title XVI of the Social Security Act is affirmed.

### REPORT AND RECOMMENDATIONS FOR DISPOSITION

MORENO, United States Magistrate Judge.

### I.

[¶ 1] The above-captioned Social Security case was referred to this Court by the District Court[1] pursuant to 28 U.S.C. § 636(b) for the purpose of conducting any necessary hearings[2] and submitting to it proposed findings of fact and recommendations for disposition of the case (Docket No. 11). After careful scrutiny of the record and based on the totality of the circumstances present, the Court does now make and propose the following Findings of Fact, Report and Recommendations for Disposition.

### II.

[¶ 2] Plaintiff, Melinda S. Darland (Darland) filed this action seeking judicial review from a final decision rendered by the Social Security Commissioner (Commissioner) denying her October 13, 1998 (October 5, 1998 protective) Application for Supplemental Security Income (SSI) benefits under Title XVI of the Social Security Act (the Act), 42 U.S.C. §§ 1381–1383c (Docket No. 13 at 1).[3] Darland's application was denied initially on December 11, 1998, and upon reconsideration (Admin.R. 77–80, 91–93, 255–58, 260–62). After a

ceded that because the insured status for her SSDI claim had lapsed on September 30, 1993, and because her condition was in remission until 1998, she did not qualify for Title II benefits (Docket No. 13 at 1–2, n. 1; 18 at 2, n. 1).

hearing (Admin.R. 24–74), an Administrative Law Judge (ALJ) determined that Darland was not disabled and therefore not eligible for SSI benefits (Admin.R. 12–20). The Appeals Council declined to review the ALJ's determination (Admin.R. 4–5), making it the final decision of the Commissioner. *See* 20 C.F.R. § 416.1481.[4]

[¶ 3] Darland then sought judicial review of the Commissioner's decision, filing a Complaint on August 8, 2001, pursuant to 42 U.S.C. § 405(g) (Docket No. 1). The Commissioner answered the Complaint and Darland moved for summary judgment (Docket Nos. 8, 12). Both parties thereafter filed memoranda detailing their respective arguments (Docket Nos. 13, 17, 18).

### III.

[¶ 4] The general issue presented is whether Darland is "disabled" within the meaning of § 1382c(a)(3)(A). This question turns in large part on whether Darland, despite an impairment that prevented her from doing her past relevant work, could nonetheless make certain adjustments and perform other work (i.e., engage in other substantial gainful activity).

[¶ 5] For the reasons more fully explained below, the Court finds and concludes that there is substantial evidence in the record to support the Commissioner's decision that Darland is not disabled and is therefore not entitled to SSI benefits.

### IV.

[¶ 6] Darland is 43 years of age (dob 10–24–58), married and has five children (Admin.R. 28, 30). She was employed as an LPN at St. Mary's Hospital in Pierre, South Dakota from 1985 to 1989 and then stopped working to become a homemaker when her fourth child was born (Admin.R. 29–30). She has not worked since March, 1989 (Admin.R. 42, 119). Darland began complaining of trouble with her bowels in 1991 and was diagnosed with ulcerative colitis or Crohn's Disease.[5] In June 1992, her symptoms had been resolved (Admin.R. 163). She did not see a doctor about her condition for almost six years (Admin.R. 232). In March, 1998, she returned to Dr. Phillip E. Hoffsten, the internist who previously treated her, complaining of mucous and blood in her stools (Admin.R. 48–49, 232–33). She then underwent two colonoscopies in April and August, 1998 (Admin.R. 186–87, 190–91, 196–98) and later reported that she was in "good spirits" (Admin.R. 226), and that her symptoms were "tolerable" (Admin.R. 219).

[¶ 7] At the August 26, 1999 hearing before the ALJ, Darland testified that since 1998, her condition had worsened (Admin.R. 38, 60) and that she could not work because she had to constantly go to the bathroom (Admin.R. 40–41). Stress, according to Darland, exacerbated her condition (Admin.R. 58). In addition to her bowel problems, Darland testified that she had debilitating headaches (Admin.R. 44) and back pain (Admin.R. 56).

[¶ 8] The ALJ reviewed the entire record and found Darland's assertions that she was completely unable to work were not credible (Admin.R. 17, 19). In doing so, the ALJ gave great weight to the opinions of state agency physicians who, after reviewing the record, found that Darland could perform light exertion work[6] (Admin.R. 155–62, 259). The ALJ also gave great weight to the vocational expert (VE)

---

4. Unless otherwise stated, references to the Code of Federal Regulations (C.F.R.) in this Report are to the C.F.R.'s 2001 edition.

5. Darland's doctors are not in complete agreement as to what exactly her problem is, but appear to lean toward the diagnosis of ulcerative colitis.

6. "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.

who testified that a person of Darland's age, education and work experience who could do light exertion work and had access to a bathroom on an as needed basis, could perform a significant number of jobs in the regional economy (Admin.R. 71–73).

## V.

[¶ 9] The salient medical evidence of record, setting forth Darland's various physical, and associated mental problems, dates back to 1991.

[¶ 10] On January 3, 1991, Darland was hospitalized in Pierre for the treatment of erythema nodosum [7] (Admin.R. 211). During her hospital stay, Darland developed severe diarrhea, which Dr. Hoffsten thought might be ulcerative colitis (Admin.R. 211).[8] While in the hospital, Darland was seen, at the request of Dr. Hoffsten, by Dr. Frank L. Dame, a clinical psychologist, for anxiety and stress related issues as well as depression (Admin.R. 206–07, 209–10). She was then examined by a proctologist who concluded that she had active colitis, consistent with Crohn's colitis (Admin.R. 177). Later that same month, Darland was hospitalized at the Mayo Medical Center in Rochester,

---

Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking, standing or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b).

7. Erythema nodosum is a type of skin inflammation that is located in a portion of the fatty layer of skin. It results in reddish, painful, tender lumps most commonly located in the front of the legs below the knees. The tender lumps, or nodules, range in size from one to five centimeters. The nodular swelling is caused by a special pattern of inflammation in the fatty layer of skin.

Erythema nodosum occurs as an isolated condition or in association with other conditions including inflammatory bowel diseases (Crohn's disease and ulcerative colitis). MedicineNet.com (Online) *http:// www.focusoncrohnsdisease. com/script/main/forum.asp? articlekey=1964 & page=1* (Last editorial review March 27, 2002).

8. Ulcerative colitis is a disease that causes inflammation and sores, called ulcers, in the top layers of the lining of the large intestine. The inflammation usually occurs in the rectum and lower part of the colon, but it may affect the entire colon. The inflammation makes the colon empty frequently, causing diarrhea. Ulcers form in places where the inflammation has killed colon lining cells; the ulcers bleed and produce pus and mucous. Ulcerative colitis is an inflammatory bowel disease that can be difficult to diagnose because its symptoms are similar to other intestinal disorders such as Crohn's disease. This disease differs from ulcerative colitis in that it causes inflammation deeper within the intestinal wall and usually occurs in the small intestine (although it can also be present in the duodenum, large intestine, appendix and anus).

The most popular theory as to the cause of ulcerative colitis is that the body's immune system reacts to a virus or a bacterium causing ongoing inflammation in the intestinal wall. People with ulcerative colitis have abnormalities of the immune system, but doctors do not know whether these abnormalities are a cause or a result of the disease. Ulcerative colitis is not caused by emotional distress or sensitivity to certain foods or food products, but these factors may trigger symptoms in some people.

The most common symptoms of ulcerative colitis are abdominal pain and bloody diarrhea. People may also experience fatigue, weight loss, loss of appetite, rectal bleeding and loss of body fluids and nutrients.

Most people can be treated with medication. In severe cases, a person may need surgery to remove the diseased colon. Surgery is the only cure for ulcerative colitis.

Some people have remissions—periods when the symptoms go away—that last for months or even years. Most people's symptoms, however, eventually return.

*"National Institute of Diabetes and Digestive and Kidney Disorders of the National Institutes of Health.* Publication 95–1597: Ulcerative Colitis (Last revised June 24, 1999) (Online) *http://www.niddk.nih.gov/health/digest/pubs/ colitis/colitis.htm "*

Minnesota, where she was treated by Dr. William J. Termaine (Admin.R. 169–70). Dr. Termaine opined that Darland had Crohn's colitis and prescribed medication and conservative treatment (Admin.R. 170).

[¶ 11] On March 6, 1991, Darland, in a follow-up appointment with Dr. Hoffsten, reported that she was no longer bleeding or having diarrhea (Admin.R. 242). In May, 1991, Darland again told Dr. Hoffsten that she was not bleeding or having diarrhea and that she was "doing very well at this time" (Admin.R. 242). Darland returned to and was examined by Dr. Termaine on June 10, 1991 (Admin. R. 166). Dr. Termaine was not sure whether Darland had Crohn's colitis or ulcerative colitis and favored the latter, which he believed was now in remission (Admin.R. 167). The next year, Dr. Termaine referred to Darland's condition as Crohn's colitis and noted that she had no diarrhea and that her condition had virtually resolved itself (Admin.R. 163).

[¶ 12] In March 1998, Darland was seen by Dr. Hoffsten after she began noticing blood and mucous in her stools (Admin.R. 232). She had been asymptomatic for approximately six years (Admin.R. 232). Hoffsten believed that the diagnosis of ulcerative colitis was "more credible" and that her colitis was "recurrent at this point" (Admin.R. 232–33). He ordered a colonoscopy and Dr. E.R. Becker, a surgeon, performed one on April 10, 1998 in Pierre (Admin.R. 196–98, 233). Dr. Becker's impression was "probable ulcerative colitis" (Admin.R. 198) and the findings of the pathologist were consistent "with quiescent colitis" (Admin.R. 188).

[¶ 13] In May, 1998, Dr. Hoffsten saw Darland and noted that her ulcerative colitis was "doing much better" and that she was down to four, primarily formed, stools

a day (Admin.R. 224). The following month, Darland advised Dr. Hoffsten that her stools for the most part seemed to be formed, but occasionally were loose and that she had "very little" blood in them. Dr. Hoffsten recommended that Darland undergo another colonoscopy and Darland agreed to do so (Admin.R. 225).

[¶ 14] On July 21, 1998, Darland reported that she was in "good spirits" and "walking up to four miles per day" (Admin.R. 226). She denied having any abdominal pain or related systemic complaints (*Id.*). In Dr. Becker's view, her condition "appear[ed] to be stable to improved relative to her symptomatic Crohn's disease" (Admin.R. 226). In his August, 1998 operative report, Dr. Becker noted "dramatic improvement" in Darland's medical therapy (Admin.R. 186). "[N]o evidence of active bleeding, gross adenomas, or similar polyps" was found in Darland's bowel by Dr. Becker and it appeared to him that her condition had improved (Admin.R. 187). Following her second colonoscopy, Darland returned to Dr. Becker, "without complaints of frequent diarrheal or grossly bloody stools ... [s]pecifically stat[ing] that her bowel movements [were] normal" (Admin.R. 227). On August 29, 1998, Darland reported to Dr. Hoffsten that she was continuing to have one to four stools per day, never formed, always with some mucous and often with a small amount of blood, but that nonetheless her situation was "tolerable" (Admin.R. 219). Dr. Hoffsten did not believe that "additional medical steps" were warranted at that time unless her condition worsened (*Id.*).

[¶ 15] A state agency physician subsequently reviewed, in December 1998, Darland's medical records and assessed her residual physical functional capacity (Admin.R. 155–62).[9] After doing so, the phy-

---

9. Residual functional capacity is what a   claimant can do despite her limitations. 20

sician concluded that Darland could lift 20 pounds occasionally and 10 pounds frequently and could stand and/or walk six hours in an eight-hour work day (Admin.R. 156), but should avoid concentrated exposure to [f]umes, odors, dusts, gases, poor ventilation, etc." (Admin.R. 159). On March 12, 1999, a second state agency physician reviewed Darland's medical records and concurred in the initial residual functional capacity assessment (Admin. R.162; see also Admin. R. 259).

## VI.

[¶ 16]   At the hearing, Darland testified that her condition had become "much worse" since 1998 (Admin.R. 51, 60). Darland said that most of the grocery shopping she left to her husband to do (Admin.R. 39) and that if she did any such shopping, she took one of her boys along to assist her (Admin.R. 52, 56). She acknowledged that she was able to do normal housework, cooking and laundry (Admin. R. 39), but maintained that these tasks took her a while to do, because of frequent bathroom visits, and that bending over and stooping made her go to the bathroom more often (Admin.R. 36, 39). She described how she would occasionally have bowel movements that would come on suddenly and without warning and run down her legs (Admin.R. 40). She claimed that she had headache pain that lasted "pretty much a full day" but was able to resolve the pain by taking Tylenol (Admin.R. 44-45). Darland testified that she had fecal incontinence once every two months, diarrhea every day, and that she went to the bathroom four times a day (Admin.R. 50). Travel, Darland asserted, was more difficult because of her need to make bathroom stops (Admin.R. 52-53). She emphasized that the more active she was, the more she needed to go to the bathroom and pointed out how she was "lucky" to get to the

corner of her block before she had to turn around and come home and use the bathroom (Admin.R. 54). She did not believe she was capable of occasionally lifting 10, much less 20, pounds (Admin.R. 55-56). She mentioned how when she had gone for short walks she would have lower back pain that would "get real bad" (Admin.R. 56). According to Darland, she would "love to work", preferring to work at home, but did not believe she could do so because of the stress involved and her frequent, unpredictable and urgent need to visit the bathroom (Admin. R. 40-41, 53-54, 57-59).

[¶ 17]   Darland's husband also testified at the hearing (Admin.R. 63-66). His testimony was consistent with Darland's.

[¶ 18]   After Darland and her husband both testified, the VE was given three hypotheticals by the ALJ. In the first hypothetical, the ALJ asked the VE to:

> [A]ssume that this hypothetical person experienced an onset of problems ... which resulted in diarrhea and subsequently in an evaluation in Mayo where she was evaluated for possible ulcerative colitis and possible Crohn's disease. That as a result, she had been diagnosed as having colitis ... or had symptoms of colitis .... [S]he was relatively well controlled for a period from 1992 until 1998. That she did have some diarrhea, but that it was not of such a degree that she was taking medical care and medical treatment .... [I]n 1998, she had a situation where she was having blood in her stools and that she had two colonoscopies .... [She] has symptoms of ulcerative colitis and ... diarrhea, ... she would have frequent requirements of going to the bathroom at unpredictable times, that about once a month she might have a situation where the stools

C.F.R. § 416.945(a).

would unexpectedly run down her leg. She had good and bad days where she would have up to three to four or three days out of seven were bad days. She does have some diarrhea everyday, sometimes she doesn't have it, but goes to the bathroom four times a day at a time. That she does have headaches ... approximately once a month .... [She was to] avoid concentrated exposure to fumes, odors, dust, gases and poor ventilation.

(Admin. R. 68–70). The VE opined that the person described could not work (Admin.R. 71).

[¶ 19] In the second hypothetical, the ALJ asked the VE to consider someone of Darland's age, with the same educational background and work history, who:

1. Could perform light work;

2. Had been diagnosed with ulcerative colitis;

3. Was taking Prednisone from 1992 to 1998 that seemed to control her condition;

4. Could work in a job where she would have access to bathrooms when needed;

5. Had headaches once a month that were treated with Tylenol; and

6. Had approximately four stools a day that were formed.

(Admin. R. 71). The VE testified that there were jobs available that were not time dependent where the hypothetical person could schedule her own bathroom breaks. These jobs included an assembler of small products, an electronics worker, a sizer, and a cleaner/housekeeper.

[¶ 20] In the third hypothetical the ALJ proposed, the VE was asked to assume that someone:

1. Was 5 foot, 2 inches tall and weighed 188 pounds;

2. Was diagnosed with an incurable disease called ulcerative colitis;

3. Was on Prednisone which controlled the inflammation, but did not control the diarrhea;

4. Had monthly headaches that lasted up to 24 hours and were not controllable with Tylenol;

5. Had symptoms of diarrhea that occurred three days out of a seven-day week;

6. Had hours of diarrhea episodes in the morning and frequently needed to use the bathroom up to several times an hour;

7. Was unable to withstand fumes; and

8. Had limits on bending, crouching and kneeling because of weight.

(Admin. R. 73). In response, the VE stated that there were no occupations in the general line of work he had just mentioned that the hypothetical person could do (Admin.R. 73–74).

### VII.

[¶ 21] Review of the Commissioner's decision is governed by § 405(g). Under this statute, "[t]he findings of the Commissioner ... as to any fact, if supported by substantial evidence, shall be conclusive." "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir.2002). In determining whether existing evidence is substantial, the Court must consider evidence that detracts from the Commissioner's decision as well as evidence that supports it. *Id.* The Court may not reverse the Commissioner merely because substantial evidence exists in the record that would have supported a contrary outcome or because the Court would have decided the case differently. *Id.*

[¶ 22] The Court defers heavily to the findings and conclusions of the Commissioner. *Howard v. Massanari*, 255 F.3d

577, 581 (8th Cir.2001). If after review, the Court finds it possible to draw two inconsistent positions from the evidence and one of those positions supports the Commissioner's findings, it must affirm the denial of benefits. *Id.; Ramirez v. Barnhart,* 292 F.3d 576, 582 (8th Cir.2002).

## VIII.

[¶ 23] Darland contends that the ALJ improperly discredited her subjective complaints and symptoms (Docket No. 13 at 4). She argues that the ALJ (and thus the Commissioner's) decision conflicts with the Eighth Circuit's holding in *Polaski v. Heckler,* 739 F.2d 1320 (8th Cir.1984) (Docket Nos. 13 at 4–16; 18 at 12–14).

[¶ 24] Pursuant to the Act, the Commissioner follows a five-step sequential evaluation process in determining disability. *See* 20 C.F.R. § 416.920(a). This process requires consideration of whether (1) the claimant is gainfully employed; (2) the claimant has a severe impairment; (3) the impairment meets the criteria of any SSI listings; (4) the impairment prevents the claimant from performing past relevant work; and (5) the impairment necessarily prevents the claimant from doing any other work. *Ramirez,* 292 F.3d at 580. If a claimant fails to meet any of these criteria, the process ends and the claimant is determined to be not disabled.

[¶ 25] In the instant case, the ALJ completed all five steps in the evaluation process, concluding that (1) Darland had not engaged in substantial, gainful activity since 1989; (2) her ulcerative colitis was a "severe" impairment; (3) her impairment did not meet or equal the criteria of any impairments listed in the SSI regulations; (4) she was unable to perform her past relevant work; and (5) her impairment did not prevent her from doing other work (Admin.R. 13–18).

[¶ 26] In evaluating Darland's subjective complaints and symptoms, the ALJ considered the factors outlined in *Polaski* and codified in § 416.929(c) [10] (Admin.R. 16–18). The ALJ also recognized that Darland had established that because she could not perform her past relevant work, the burden shifted to the Commissioner to show that there were jobs existing in the national economy which she could perform (Admin.R. 18). *See Krogmeier,* 294 F.3d at 1022. Nevertheless, the ALJ found that Darland's subjective complaints were not consistent with evidence of record and that her allegations of being unable to work were not credible (Admin.R. 19).

[¶ 27] An ALJ may discount a claimant's subjective complaints if there are inconsistencies in the evidence as a whole. *Goodale v. Halter,* 257 F.3d 771, 774 (8th Cir.2001), *cert. denied,* —— U.S. ——, 122 S.Ct. 1212, 152 L.Ed.2d 149 (2002); *McKinney,* 228 F.3d at 864. Where there is good reason for discrediting a claimant's objective complaints, the ALJ's decision cannot be disturbed. *Gowell v. Apfel,* 242 F.3d 793, 796–97 (8th Cir.2001); *Dunahoo v. Apfel,* 241 F.3d 1033, 1038 (8th Cir. 2001).

---

**10.** These factors are as follows:

1. The claimant's daily activities;
2. The location, duration, frequency and intensity of the claimant's pain or other symptoms;
3. The factors that precipitate and aggravate the symptoms;
4. The type, dosage, effectiveness and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms;
5. The treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms;
6. Any measures other than treatment the claimant uses or has used to relieve pain or other symptoms; and
7. Any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms.

*See also, McKinney v. Apfel,* 228 F.3d 860, 864 (8th Cir.2000) (listing factors).

[¶ 28] Here, there are a whole host of inconsistencies in the record that support the ALJ's credibility determination. Some of the more glaring ones include the following:

1. Although she contended that her condition had worsened between 1998 and when the hearing was held (Admin.R. 51, 60, 143, 149), Darland testified that she did not see any need to go back to a doctor and that she did not even schedule an appointment with one during this time period. (Admin.R. 61, 144, 150).

2. She said that she was "lucky" if she was able to walk down to the corner before she had to return home and go to the bathroom (Admin.R. 54). On July 13 and 20, 1998, however, she reported to Dr. Hoffsten's nurse that she was walking one and-a-half to two miles each day (Admin.R. 225–26), and then told Dr. Becker, on July 21, 1998, that she was walking up to four miles a day (Admin.R. 226).[11]

3. She claimed she had back pain (Admin.R. 56), but later testified that she did not have any health problems besides her colitis (Admin.R. 41). In addition, she never disclosed her back problem in any of the reports she filed with the Commissioner (see e.g. Admin. R. 143, 149).

4. She maintained that the stress of a job caused her to go to the bathroom more often and aggravated her condition (Admin R. 130, 143, 152), but indicated that she would like to work at home where she was comfortable and close to a bathroom (Admin.R. 57–58).

5. She averred that she had trouble finishing a task or chore she had begun, yet stated otherwise at the hearing (Admin.R. 53–54) and in her reconsideration requests (Admin.R. 145, 151).

6. She contended that she was able to do cooking, laundry and household work (Admin.R. 39, 129), but could not lift a gallon of milk or a bag of sugar (Admin.R. 56).

7. She testified that she would take one of her three boys to help her grocery shop (Admin.R. 52), but denied that anyone helped her with her shopping in the daily activities questionnaire she completed and filed with the Commissioner (Admin.R. 128).

8. Shortly before filing her SSI application, she returned to Dr. Becker "without complaints of frequent diarrheal, grossly bloody stools" stating that her "bowel movements were normal" (Admin.R. 227). She also reported to Dr. Hoffsten at the same time that she was having from one to four stools a day and that her symptoms were "tolerable". (Admin.R. 219). .

[¶ 29] Aside from these inconsistencies, there are other factual circumstances in the record that call into question Darland's subjective complaints and her assertion that she was unable to work at all. First, it is significant that Darland's treating physicians never placed any restrictions on her, let alone opined that she was disabled. The absence of any physician ordered limitations strongly militates against any claim of total disability. See *Tennant v. Apfel,* 224 F.3d 869, 871 (8th Cir.2000); *Hutton v. Apfel,* 175 F.3d 651, 655 (8th Cir.1999).

11. Darland testified that the more active she was, the more she had to go to the bathroom (Admin.R. 54). Assuming this to be true, how then was she able to walk these distances without going to the bathroom and exacerbating her condition?

[¶ 30]  Second, the fact that Darland was able to do her normal housekeeping chores (cooking, vacuuming, dusting, cleaning, dishes and laundry), shop, read, watch television, pay bills, care for her children, run errands and go for walks (Admin.R. 39, 51–53, 128–129), while not dispositive, is nonetheless persuasive evidence that buttresses the ALJ's assessment of her credibility.  *Ramirez*, 292 F.3d at 582; *Dunahoo*, 241 F.3d at 1038.

[¶ 31]  Third, the ALJ observed that there was no medical evidence to support Darland's complaints of debilitating headaches (Admin. R. 17; *see also* Admin. R. 44–45).  Nor was there any mention in her medical records to Darland complaining of back pain or having any back problems.  The lack of corroborating medical evidence as to these complaints undermines her testimony.  *See Ramirez*, 292 F.3d at 582; *Wheeler v. Apfel*, 224 F.3d 891, 895 (8th Cir.2000).

[¶ 32]  Fourth, it appears that Darland has had problems coping with stress for many years.  In 1991, she was referred by Dr. Hoffsten for a psychological consult and was diagnosed with a stress related anxiety disorder and depression (Admin.R. 210).  Dr. Dame implemented a relaxation program, using mental imagery, to help her work through the phobias she suffered from (Admin.R. 207, 209).  Seven years later, Darland again complained of stress, listing it as a related cause to her ulcerative colitis and her ultimate disability (Admin.R. 130, 143, 152).  There is nothing in the record to demonstrate that she tried to address her stress problem by seeing a mental health professional, obtaining treatment, counseling or therapy or by using some other means (besides taking Tylenol).  Darland made some positive strides toward controlling her stress and anxiety in 1991 and she provided no explanation as

to why she could not again undertake some kind of stress management to relieve, or at least lessen, her stress level and improve her condition, and thus her ability to work.

[¶ 33]  Fifth, Darland's residual functional capacity, as determined by the ALJ, is in accord with the opinions of the state agency physicians (Admin.R. 15–16, 155–62), the medical evidence presented and her own oral and written statements.  Opinions of consulting physicians may serve as substantial evidence when they are supported by other evidence in the record and are consistent with it.  *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir.2000); *Smallwood v. Chater*, 65 F.3d 87, 89 (8th Cir.1995); *see also Hight v. Shalala*, 986 F.2d 1242, 1244, n. 1 (8th Cir.1993).

[¶ 34]  Sixth, the testimony of the VE supports the ALJ's finding that Darland is not disabled.  When asked to consider a person of Darland's age, education and work experience with a residual functional capacity described by the state agency physicians, the VE opined that the person would be able to perform certain unskilled jobs that permitted her to complete tasks on her own schedule and take bathroom breaks when needed (Admin.R. 71–72).  The ALJ properly relied on the VE's testimony and response to an appropriate hypothetical question in determining whether the Commissioner had met her burden of proving that there were a significant number of jobs that existed in the region that Darland could perform.  *Pearsall v. Massanari*, 274 F.3d 1211, 1220 (8th Cir.2001).

[¶ 35]  Finally, despite complaints that her condition had worsened, Darland did not go back to Drs. Hoffsten or Becker or seek remedial assistance from any other healthcare providers for 8–12 months.[11]  Darland's "failure to seek medical assistance for her alleged physical impairment

---

11.  In a letter dated January 20, 1999, Dr. Hoffsten makes reference to sending copies of  his medical notes from August 29, 1998 to

[ ] contradicts her subjective complaints of a disabling condition [ ] and supports the ALJ's decision to deny benefits." *Gwathney v. Chater,* 104 F.3d 1043, 1045 (8th Cir.1997).

## IX.

[¶ 36] Darland argues that the ALJ erred in finding that she had four *formed* stools a day and that because the VE's second hypothetical was predicated on such a finding, it too was erroneous and resulted in an opinion that could not be relied on (Docket No. 13 at 9–11, 16–17). It appears that Darland never specifically told anyone that *all* her daily stools were formed completely. She did, however, report to Dr. Hoffsten on May 27, 1998, that she was "down to 4 stools a day" and that her "stools [were] *primarily* formed" (Admin.R. 224) (emphasis added). The following month, she advised him that her "stools, *for the most part* [,] *seemed to be formed* and occasionally they [would] be loose" (Admin.R. 226) (emphasis added). In August, 1998, she informed Drs. Becker and Hoffsten that she was having "normal" bowel movements one to four times a day (Admin.R. 219, 227). Three months later, she apparently told Dr. Hoffsten that "[h]er stools *are formed* often four per day" (Admin R. 39) (emphasis added). At

the hearing she testified that four times a day was an "accurate assessment" of how often she went to the bathroom each day (Admin.R. 50) [12].

[¶ 37] This evidence alone is substantial enough to support the ALJ's finding and the "four formed stool" portion of the hypothetical question he posed to the VE. *See Hutton,* 175 F.3d at 656–57. More importantly, the ALJ's hypothetical adequately captured the concrete consequences of Darland's deficiencies and set forth the impairments he accepted as true in light of the medical evidence and the record as a whole. *Davis v. Apfel,* 239 F.3d 962, 966–67 (8th Cir.2001); *Warburton v. Apfel,* 188 F.3d 1047, 1050–51 (8th Cir.1999). Significantly, Darland's own testimony concerning the number of stools she had each day was contradictory. She claimed that the frequency of her stools had increased since March, 1999, and that she had bowel movements "more often than four times" every day (Admin. R. 37; *see also* Admin. R. 38). She later testified though that she went to the bathroom four times a day (Admin.R. 50). It is therefore easy to see why the ALJ refused to credit a large part of her testimony and phrased the hypothetical in the manner that he did.[13] *See Young v. Apfel,* 221 F.3d 1065, 1069–70 (8th Cir.2000).

November 19, 1998 to the Disability Determination Services in Sioux Falls, South Dakota (Admin R. 217). These notes, however, are not contained anywhere in the record. Yet even if Darland was seen by Dr. Hoffsten in November, 1998, which is not altogether clear (*see* Admin. R. 37–38), the record indicates, and she testified on August 26, 1999, that she had not sought or received medical care for this problem for at least eight months (Admin.R. 39–40, 61, 144, 150).

Darland claims that the ALJ overlooked Dr. Hoffsten's letter, the "only record in the file ... dated subsequent to her application for [SSI] benefits" (Docket No. 18 at 3). A review of the record, however, reveals that this "record" is based on Dr. Hoffsten's medical

notes from 1998 and that the last time he had seen Darland had been two and-a-half months before the letter was written (Admin.R. 39–40, 217) and maybe even longer (Admin.R. 37–38, 219).

12. It is interesting to note that Darland's own counsel when questioning her, recognized that Dr. Hoffsten's "reports are suggesting four formed stools a day and they don't mention at all the diarrhea cycle" (Admin.R. 60–61). Although not sure, Darland "thought" she "mention[ed] to him diarrhea along with formed stools" (Admin R. 61).

13. It is plain from the record that the ALJ, at times, questioned the truthfulness of Dar-

[¶ 38] Regardless, the fact that the VE was asked to assume that the hypothetical person's four daily stools were *formed* did not vitiate or unduly taint the reliability of his opinion, because he was likewise asked to assume that the person "was capable of working . . . in a job where she would have access to bathrooms when needed" (Admin.R. 71). It is this "bathroom availability" component of the hypothetical that makes the "formed stool" component of little, if any, importance. The VE's opinion most certainly demonstrates that a person in Darland's shoes who had four stools in a day (whether formed, runny or a mixture of the two) and had access to a bathroom as needed, could work in jobs that were prevalent in the three-state area of North Dakota, South Dakota and Minnesota. The *critical difference* between the three hypotheticals and the VE's responses to the same is the absence (in the case of the first and third hypotheticals) and the presence (in the case of the second one) of the "accessability to bathrooms when needed" component.

[¶ 39] In any event, Darland readily admitted that she was able to perform her household labors with appropriate bathroom breaks (Admin.R. 36) and that she had in mind working at home where she felt comfortable and had ready access to a bathroom (Admin.R. 57–58). These admissions indicate, or at least strongly suggest, that Darland believed she could work if she had bathroom facilities in close proximity to her and could use them whenever she needed them.

## X.

[¶ 40] Insofar as Darland contends that the ALJ's decision was not supported by substantial evidence in the record as a whole, her contention must fail. The ALJ properly performed the analysis required under *Polaski* and § 416.929(c) in evaluat-

ing Darland's subjective complaints and the extent to which her symptoms affected her ability to work. *Krogmeier*, 294 F.3d at 1024; *Ramirez*, 292 F.3d at 580–82; *see also Dunahoo*, 241 F.3d at 1038. The Court agrees with the ALJ that while Darland suffered from a colitis related impairment, she nonetheless retained the residual functional capacity to perform work at the light level of physical exertion. *Ramirez*, 292 F.3d at 583. After a thorough review of all relevant evidence, including the medical records, the opinions of the physicians and the VE and Darland's statements regarding her daily activities and overall condition, the Court concludes that there is substantial evidence in the record to support the ALJ and Commissioner's decisions to deny SSI benefits.

## XI.

[¶ 41] Based on the foregoing findings, conclusions and analysis and in light of the entirety of the record, it is hereby

[¶ 42] RECOMMENDED that Darland's Motion for Summary Judgment (Docket No. 12), be denied in all respects and with prejudice. It is further

[¶ 43] RECOMMENDED that judgment be entered forthwith and in accordance with § 405(g) affirming the decision of the Commissioner.

Aug. 6, 2002.

## NOTICE

Failure to file written objections to the within and foregoing Report and Recommendations for Disposition within ten (10) days from the date of service shall bar an aggrieved party from attacking such Report and Recommendations before the as-

land's testimony (*see e.g.* Admin. R. 33, 39– 40, 61–62).

signed United States District Judge. *See* 28 U.S.C. § 636(b)(1).